Joan MAHONEY, Plaintiff,

v.

Kenneth S. APFEL, Commissioner
of Social Security, Defendant.

No. 98 CV 92(NG).

United States District Court,
E.D. New York.

May 3, 1999.

Richard Nager, Binder and Binder, Jericho, NY, for plaintiff.

Elliot Schnacter, United States Attorney's Office, Civil Division, Brooklyn, NY, for defendant.

## ORDER

GERSHON, District Judge.

Plaintiff Joan Mahoney brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits. Plaintiff and defendant each move for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Plaintiff filed an application for Disability Insurance Benefits on February 17, 1994. Following the denial of her application, an administrative hearing was held on September 18, 1995 before Administrative Law Judge ("ALJ") Sol A. Wieselthier.

The ALJ found that plaintiff was able to return to her past relevant work during the time prior to December 31, 1993, the date plaintiff was last insured and, thus, that she was not disabled within the meaning of the Act. The Appeals Council denied plaintiff's request for review on November 7, 1997, and plaintiff commenced this action.

### Facts

*Plaintiff's Background and Testimony*

Plaintiff was represented by counsel at the hearing, on the appeal to the Appeals Council, and is also represented in this action. Plaintiff was born in New York on June 10, 1949, and is 50 years old. She is a high school graduate, and the mother of two grown daughters. She is a widow; her husband died in 1985 while driving an allegedly defective rental car. Prior to the onset of her disability, plaintiff worked in various jobs, including, as a salesperson and, most recently, as a legal secretary. In her work as a legal secretary, her responsibilities consisted primarily of writing reports, taking stenography, typing and using a computer. In a typical day, plaintiff estimated that she sat for eight hours, occasionally lifted objects of up to ten pounds, and occasionally performed some bending and reaching. She worked at her last job from November 1990 until February 1991, and she has not worked since then. Although plaintiff was left a sum of money by her husband, she expended all of her savings and eventually sold her house during the course of pursuing legal actions against the rental car company and, subsequently, against her lawyer for malpractice. Plaintiff presently has no source of income.

Plaintiff was first diagnosed with multiple sclerosis in August 1989, although she thinks in hindsight that she has suffered from certain symptoms for as far back as her childhood. Plaintiff's mother also suffers from multiple sclerosis. Plaintiff reported that her symptoms first began to affect her job performance and work at-

tendance in March 1985. Symptoms, including numbness of the hands, poor bladder control, failing eyesight and fatigue continued to worsen and prompted her to seek medical treatment in 1989, but she continued to work sporadically until her termination from her last job in 1991.

At the hearing before the ALJ, plaintiff emphasized that her symptoms often fluctuate and can become significantly worse when exacerbated by conditions such as stress and warm weather. The most recent exacerbation had occurred around March 1995 when plaintiff was "in very bad shape." Tr. 41.[1] Her exacerbations typically last anywhere from one to three weeks. Plaintiff believes that the severity and fluctuation of her limitations prevented her from working on a full-time basis since 1989.

Plaintiff testified that she cannot feel her hands and, without concentration, is unable to sense what she is holding in her hands. She has trouble feeding and dressing herself and is unable to button her clothing. With the initial onset of the symptoms in her hands, plaintiff was unable to write, but she has since devised a way of writing by guiding one hand with the other. She thus similarly struggles to put on her makeup in the mornings. She remains uncoordinated and feels her equilibrium is "off," and that she has to "balance" herself all the time. She is able to walk for approximately a block, although her ability to walk varies and she can become extremely tired. She cannot stand for more than five minutes. Plaintiff does not have difficulty sitting, but does not like to sit for more than an hour at a time without getting up and walking around to prevent her legs from becoming too weak. She is unable to shop, clean, or cook for herself. She has a friend make breakfast for her, and orders out for every other meal. She can carry approximately ten pounds; as with her other symptoms, however, the bad spells significantly curtail her abilities to the point where she feels "like my insides were going to fall out if I carried [a pocketbook]." Tr. 49.

A significant reason why plaintiff feels that she is unable to work is that she has very poor bowel control and suffered two accidents in the past. As a result, plaintiff maintains a three hour routine every morning in which she relies on suppositories to empty completely her bowels and which, through the extreme exertion, leaves her feeling as exhausted as if she had been "lifting a barbell." Tr. 45. She also suffers from frequent urinary tract infections for which she takes Keplex and Arecoline, and she needs to go to the bathroom as often as every thirty minutes.

As for her daily activities, plaintiff testified that she watches some television, walks around the block, goes to the bank, pays bills, writes letters, and goes to the movies about once a month. She explained that doing even everyday tasks, such as waiting in line for ten minutes at the bank, leaves her exhausted. Plaintiff further stated that she spends a great deal of time and energy on her ongoing legal disputes. At the time of the hearing, plaintiff was pursuing a malpractice action against the lawyer who had represented her in an earlier action against the rental car company that had rented the car plaintiff's husband was driving at the time of his death. When questioned by the ALJ, plaintiff revealed that she had suffered significant emotional distress as a result of her circumstances and had sought psychiatric treatment in 1992 at the Karen Horney Clinic.

*Medical Evidence*

Plaintiff's primary treating physician since 1989 has been Dwight J. Rosenstein, M.D. Dr. Rosenstein, a neurologist, examined plaintiff on August 21, 1989. His report noted complaints of symptoms since about 1984 including urinary hesitancy and periods of numbness in her legs which lasted two to three weeks and caused stiffness and unsteadiness. These symptoms

1. Numbers preceded by "Tr." refer to pages of the Record attached to defendant's answer.

appeared to correspond to periods of stress. Plaintiff reported a significant episode in April 1989 when she experienced numbness in her hands, around her chest and around her thorax. A visit to the North Shore University Hospital Emergency Room at that time revealed a normal CT scan of the head, but follow-up treatment with a neurologist was recommended. Ten days prior to her visit with Dr. Rosenstein, plaintiff experienced a slight spinning sensation, some nausea, difficulty focusing her vision and an unstable gait.

Dr. Rosenstein's general examination of plaintiff revealed nothing remarkable. His detailed neurological examination showed nystagmus on her right lateral gaze but otherwise full extraocular movements. The doctor detected no sensor abnormalities and found her strength to be full. However, there was some incoordination with rapid alternating, fine finger, and finger-to-nose movements, especially with the right hand. Her reflexes were brisk throughout, with some asymmetry and a right extensor plantar response. Her gait was somewhat hesitant, exhibiting a tendency to sway. Dr. Rosenstein concluded that plaintiff had a history and symptoms that suggested "dysfunction of several parts of the nervous system" and the "most likely diagnosis is demyelinating disease, that is, multiple sclerosis." An MRI taken on August 28, 1989 confirmed "extensive demyelination consistent with multiple sclerosis," Tr. 149, and evoked potential testing revealed normal results. Tr. 142–49.

On February 10, 1992, plaintiff talked by phone with Joan Gross, a certified social worker at the Karen Horney Clinic, to seek psychological treatment. Ms. Gross's notes indicate that plaintiff felt overwhelmed by her complicated legal problems, the death of her husband, and her multiple sclerosis. According to Ms. Gross's notes, plaintiff was embroiled in a stressful malpractice suit in which she was alleging sexual harassment and negligence against her former attorney, who was also a family friend. Treatment notes dated April 2, 1992 and covering the period between March 2, 1992 and April 2, 1992 reported that plaintiff had no previous mental health diagnoses or admissions, but that she had a history of trauma which was prompting her to seek treatment. Ms. Gross described plaintiff as feeling isolated, confused, lethargic, and bothered by intrusive thoughts and flashbacks. Plaintiff reported strong feelings of revenge and feeling trapped in her feelings of anger. She felt hopeful that therapy would enable her to focus on her career. Ms. Gross noted that plaintiff's affect was appropriate to her mood, described as anxious, but her insight and judgment were poor. Ms. Gross diagnosed plaintiff as suffering from post traumatic stress disorder. She recommended therapy twice a week. Ms. Gross described as follows the change in conditions recommended before plaintiff would be discharged from her treatment program: "patient will have integrated trauma and will have returned to previous level of functioning; patient will be able to return to employment." Tr. 170. There is no indication in the record as to the duration of plaintiff's treatment at the clinic.

On June 18, 1992, plaintiff returned to see Dr. Rosenstein for the first time since her 1989 visit. Dr. Rosenstein noted that her prior symptoms related to her MS had improved remarkably, although plaintiff appeared to have persistent difficulty with her legs and her right arm, as well as problems with her bowel and bladder functions. Dr. Rosenstein reported that her bowel function seemed to improve with glycerine suppositories and recommended very low doses of Urecholine to help plaintiff initiate her urinary stream. Her physical examination was "essentially unremarkable" except for some dysdiadochokinesis bilaterally in the upper extremities, clonus at the ankles and a left Babinski response. The doctor noted that tone in the left lower extremity was increased

but strength was full throughout. He concluded that plaintiff continued to have minor symptoms of MS that were mostly related to bowel and bladder function.

Plaintiff returned to see Dr. Rosenstein on January 28, 1993. She appeared to be suffering an exacerbation of her MS, with symptoms of feelings of faintness while driving, clogged ears, extreme unsteadiness on her feet and numbness around her nose, lips and in her face. Plaintiff also exhibited some difficulty with rapid alternating movements and finger-to-nose movements. Her tone was increased in both lower extremities. There was weakness of the iliopsoas muscles. Reflexes were two to two and a half in the upper extremities (out of a normal value of five) and three to three and a half in the legs with some clonus. The doctor noted that plaintiff continued to have difficulty urinating and suspected that she suffered from a urinary tract infection. He also related many of her symptoms to her ongoing legal situation and speculated that her condition would improve when the legal problems were resolved as "that has been a scenario that has played itself out in the past with Ms. Mahoney." Tr. 140. He recommended steroid medication, which plaintiff was unwilling to take at that time.

Plaintiff's next visit with Dr. Rosenstein was on July 29, 1993. The doctor noted that plaintiff had been doing very well lately and that, despite her recent psychological problems, she had resolved to stop feeling sorry for herself. The symptom which prompted her visit was described by the doctor as a mild exacerbation of her MS in the form of optic neuritis which was causing blurred vision. Plaintiff reported that her vision improved at night and in cooler temperatures. She also stated that she had been bumping into things again and felt somewhat clumsy in her upper extremities. The doctor's examination revealed minimal disc pallor, full extraocular movements, no pronator drip and a normal gait. He recommended intravenous Symmetrel as treatment for her optic neuritis,

but plaintiff was apparently unwilling to consider this at that time. A visual evoked potential testing was performed on August 2, 1993, which revealed normal results consistent with a delay in the visual pathway anterior to the optic chiasm.

Dr. Rosenstein completed a report for the New York State Department of Social Services dated May 7, 1994. He listed a diagnosis of multiple sclerosis for plaintiff, citing the 1989 MRI and two evoked potential testing as the basis for his diagnosis. The remainder of the report consisted of summaries of his treatment notes.

On August 4, 1994, plaintiff returned to see Dr. Rosenstein. The doctor noted that she had been feeling well lately and that her legal and psychological problems had been brought under control. As a result, plaintiff felt her MS symptoms had improved and she had lost her excess weight. She continued to have difficulty, however, with her coordination, especially with the right-sided limbs when she overdoes it or becomes over-heated. The doctor's examination revealed some incoordination of the right upper extremity especially with rapid alternating movements and finger-to-nose testing. Her gait was essentially normal, but she had a great deal of difficulty with tandem walking. The doctor concluded that plaintiff was relatively stable, and "her MS seems to be quiescent at the current time but it clearly has been exacerbated in the past by various stresses in her life back in the late 1980's and up to a year or so ago." He recommended that "no further therapy or investigations are required at this time." Tr. 159.

Another visit to Dr. Rosenstein on February 8, 1995 revealed increased symptoms possibly connected with continuing difficulties with plaintiff's legal situation. She reported numbness and decreased sensitivity in her legs, especially around the right ankle. She described feeling numb from the waist down and continued urinary urgency. The examination revealed a somewhat stiff gait, weakness most notably in the right lower extremity, sustained clonus

at the right ankle, and a more apparent spastic paraparesis with bilateral Babinski responses. The doctor opted to defer medication for the time being in hopes that her symptoms may improve once her emotional difficulties improve. Tr. 160.

At the hearing before the ALJ, Dr. Harold Berson, a non-examining medical expert, testified that he agreed with the medical findings supporting a diagnosis of multiple sclerosis. He emphasized that there seemed to be psychological factors which could account in part for her physical difficulties and that he believed there was a very strong interrelationship between the physical and emotional difficulties. Although the records from plaintiff's psychological treatment were not available at the time of the hearing, Dr. Berson stated that, "if you do get forms of material from Karen Horney that corroborate what was going on here, then automatically you don't even need my opinion because my opinion is that she does have multiple sclerosis with corroboration from the Karen Horney, she would meet the listings [from 11.09C] for multiple sclerosis.... In other words, if we accept what she says with the symptoms that she's described, it's consistent with meeting the listings for the multiple sclerosis." When asked by the ALJ what his opinion would be if the psychological records were inconsistent, Dr. Berson replied, "then we really have to evaluate it." Tr. 91–92. After he received and reviewed the records from the Karen Horney clinic, detailed above, Dr. Berson filled out a form indicating that the records did not change his testimony. Tr. 172.

Additional medical records were submitted to the Appeals Council after the ALJ's decision. A report from Dr. Rosenstein dated November 20, 1996 detailed plaintiff's physical condition and included information provided by plaintiff's children. The doctor noted that plaintiff's children had informed him of certain conditions that plaintiff had not expressed to him earlier because she is "not a complainer."

According to her children, after about an hour of an activity plaintiff often developed excessive and overwhelming fatigue, washout of her vision, and extreme uncoordination with her upper extremities and her gait. She has a great deal of difficulty managing the activities of daily living and spends an excessive amount of time getting herself dressed and prepared in order to go out of the house. A physical examination performed that day revealed difficulty with eye movements. Strength testing was initially good, but with repeated testing plaintiff seemed to fatigue. The doctor noted some definite spasticity in the lower extremities, and her gait was medium to wide-based with a lurching quality to it and a tendency to veer in either direction that worsened the longer she walked. Dr. Rosenstein concluded that, based upon her current history, the family's reports, and plaintiff's inability to care properly for herself, plaintiff appeared to be completely disabled. Tr. 185.

In a letter addressed to plaintiff's counsel and dated April 18, 1997, Dr. Rosenstein summarized his medical findings to date and largely reiterated his observations from her most recent visit with him. He concluded that plaintiff had been disabled for a number of years as a result of the symptoms of MS. He further stated that "it is my professional opinion that at no time since at least 12/31/93 would Ms. Mahoney have been able to work on a sustained basis in a competitive environment due to the symptoms I have described above and therefore I consider her disabled." Tr. 177.

*The ALJ's Decision*

In his May 30, 1996 decision, the ALJ found that plaintiff was not disabled as, according to his determinations, she was able to return to her past relevant work as a legal secretary as of December 31, 1993, the date she was last insured. The ALJ considered both plaintiff's exertional and nonexertional impairments, which he listed as symptoms related to multiple sclerosis and traumatic stress disorder. He con-

cluded that the medical evidence established that, on the date her insured status expired, plaintiff had a "severe impairment or combination of impairments but retained the residual functional capacity to return to the work she performed in the past." Tr. 17.

The ALJ noted that he considered Dr. Berson's opinion that claimant would have an impairment that meets the criteria of a listed impairment described in Appendix 1 of the Regulations if there was additional evidence indicating strong psychological factors. However, he found no continuing severe emotional problems that would exacerbate plaintiff's multiple sclerosis and therefore determined that she did not have an impairment that met the criteria of any of the listed impairments. The ALJ further found that no treating or examining physician mentioned findings equivalent in severity to the criteria of any listed impairment.

Finding no listed impairment, the ALJ evaluated plaintiff's residual functional capacity and determined it to be sufficient to perform the exertional demands of sedentary work or work which is generally performed while sitting and never requires lifting in excess of ten pounds. He concluded that, although the medical evidence established that she was not able to lift more than ten pounds or to stand or walk for prolonged periods, she was still able to stand and walk for occasional periods and to sit for a long period of time. The ALJ reviewed and summarized Dr. Rosenstein's medical reports and asserted that these findings confirmed plaintiff's ability to perform sedentary work.

The ALJ rejected as "not entirely credible to the extent alleged" plaintiff's statements concerning her impairments and their impact on her ability to work on the date her insured status expired. He cited the degree of medical treatment required, the reports of the treating and examining practitioners and the findings made at the hearing as reasons for this conclusion. He also stated, without indicating his bases for

so concluding, that plaintiff's psychological symptoms seemed under control. Finally, he noted that plaintiff did not make any attempt to seek neurological treatment during the period from August 1989 to June 1992, stating that "[t]he lack of further treatment during this period constitutes confirmation that the claimant's statements about her ability to work are not entirely credible to the extent alleged." Tr. 19.

The ALJ completed a Psychiatric Review Technique Form as part of his decision. He noted an anxiety related disorder, specifically post-traumatic stress disorder, but found only slight restrictions of activities of daily living and slight difficulties in maintaining social function. He concluded that there were no symptoms to support a finding of complete inability to function independently outside the area of her home.

## Discussion

District courts are not empowered to review the Commissioner's denial of disability benefits *de novo*. *See Fishburn v. Sullivan*, 802 F.Supp. 1018, 1023 (S.D.N.Y.1992). Absent legal error, the Commissioner's finding that a claimant is not disabled is conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Filocomo v. Chater*, 944 F.Supp. 165, 168 (E.D.N.Y.1996). Substantial evidence is defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quotation omitted). "[T]he Secretary's findings are conclusive even when a court's independent analysis of the evidence may differ from the Secretary's analysis." *Ortega v. Shalala*, No. 94 Civ. 0941, 1995 WL 133806 at *3 (S.D.N.Y. March 27, 1995) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.1982), cert. denied, 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983)). If the court finds that the Commissioner's ruling was not supported by substantial evidence, the

court has authority to reverse with or without remand. *See* 42 U.S.C. § 405(g).

## Determination of Disability

A claimant seeking Disability Insurance Benefits is considered disabled if she is unable to engage in substantial gainful activity by reason of a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. *See* 42 U .S.C. § 423(d)(1)(A). The Secretary has established a five-step test for considering disability claims.

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam). The claimant bears the burden of proof as to the first four steps. If the claimant establishes that her impairment prevents her from performing her past work, the burden shifts to the Commissioner to prove the last step. *See id.*

Appendix 1 of the regulations recognizes three forms of multiple sclerosis which would qualify as a listed impairment: disorganization of motor function; visual or mental impairment; and significant fatigue demonstrated on physical examination. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1 §§ 11.09A–C. To meet the standard of the multiple sclerosis listing as it applies to persons with significant fatigue, a claimant must have a diagnosis of multiple sclerosis with "significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." *Id.* at § 11.09C.

Dr. Berson, the medical expert who testified at the hearing, emphasized that, if plaintiff could substantiate the psychological difficulties she described, with records from the Karen Horney Clinic, she would meet the listings for Section 11.09C. After the hearing, the ALJ forwarded copies of these records to Dr. Berson with explicit instructions to advise him of any changes in the doctor's testimony that was prompted by the additional information. Dr. Berson responded by checking the line stating, "This evidence will not change my testimony."

In his decision, the ALJ seemed to presume that Dr. Berson's response supported his own conclusion that "the evidence submitted by the clinic did not reveal continuing severe emotional problems that would exacerbate the claimant's multiple sclerosis" and thus plaintiff did not have "an impairment which met the criteria of any of the listed impairments." Tr. 17. Plaintiff argues that the ALJ mischaracterized Dr. Berson's response, contending instead that his one-line response signified his adherence to his opinion that plaintiff had indeed met the criteria for the listed impairment. The transcript of the hearing supports plaintiff's interpreta-

tion. Dr. Berson reiterated several times that it was important to note that plaintiff had demonstrated a strong relationship between her emotional problems and exacerbations of her multiple sclerosis symptoms. The hearing closed with the following:

> Dr. Berson: In other words, if we accept what she says with the [psychological] symptoms that she's described, it's consistent with meeting the listings for the multiple sclerosis.
>
> ALJ: Right, and if not?
>
> Dr. Berson: And if not, then we really have to evaluate it.

Thus, the ALJ's own medical expert was of the opinion that plaintiff had established that she met the criteria of a listed impairment under Section 11.09C.

■ The Commissioner now emphasizes that a non-examining doctor's opinion is entitled to little weight, *see, e.g., Hidalgo v. Bowen*, 822 F.2d 294, 296–97 (2d Cir. 1987), a principle normally pressed by claimants. But even assuming the Commissioner can call upon a non-examining medical expert and then reject his evidence when it supports the plaintiff, here, rejection of Dr. Berson's evidence does not avail the Commissioner. This is because the Karen Horney records clearly *do* support the existence of psychological trauma during the relevant time period. Although Dr. Rosenstein reported in his notes dated July 29, 1993 that plaintiff had "resolved" to stop "feeling sorry for herself" and that she had a "much better outlook on life," the only psychological treatment records clearly show that plaintiff experienced psychological difficulties of an undetermined duration. Given this evidence in the record, the ALJ was not entitled to substitute his own medical opinion that plaintiff did not suffer any "continuing severe emotional problems that would exacerbate [her] multiple sclerosis." Tr. 17.

■ Even if not treated as meeting the listings, plaintiff must prevail because the ALJ's conclusion that plaintiff retained the residual functional capacity to return to her past relevant work is not supported by substantial evidence. The Commissioner argues that the ALJ considered Dr. Rosenstein's reports and properly determined that the treating physician's finding of disability was not supported by the medical evidence or other substantial evidence. Dr. Rosenstein, as plaintiff's main treating physician, affirmatively stated that plaintiff was disabled on her last insured date. As he asserted in his April 1997 letter, it was his professional opinion that "at no time since at least 12/31/93 would Ms. Mahoney have been able to work on a sustained basis in a competitive environment due to the symptoms I have described above and therefore I consider her disabled." The Commissioner's argument that an ALJ is not bound by the treating physician's opinion if that opinion is contradicted by the doctor's own contemporaneous notes has no relevance here. Not only did the MRI show "extensive demyelination consistent with multiple sclerosis," Tr. 149, but the doctor's clinical notes confirm the disease and its symptoms. That the symptoms were sometimes better and sometimes worse does not contradict the doctor's opinion as to disability. The Social Security Administration in 20 C.F.R. Pt. 404, Subpt. P, App.1 describes multiple sclerosis as a condition which is "episodic in character." The contemporaneous treatment notes never state that plaintiff is *not* disabled or that she can work, and they consistently document exacerbations of plaintiff's neurological system that varied in duration, severity and physiological location but were nonetheless present. Moreover, Dr. Rosenstein mentioned several times plaintiff's ongoing legal problems and the deleterious effect the emotional fallout from these legal problems had on plaintiff's physical condition.

In short, Dr. Rosenstein's diagnosis and opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and thus is entitled to controlling weight. *See* 20 C.F.R.

§ 404.1527(d)(2); *Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir.1999). Instead, the ALJ arbitrarily substituted his own judgment which he should not have done, *see McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983), and he failed to provide an "overwhelmingly compelling" analysis to justify discrediting the treating physician's opinion, *see Rosa*, 168 F.3d at 79; *Wagner v. Secretary of Health and Human Servs.*, 906 F.2d 856, 862 (2d Cir.1990).

■■■ The ALJ also improperly discredited plaintiff's subjective complaints. An ALJ may disbelieve pain testimony "after weighing the objective medical evidence in the record, [claimant's] demeanor, and other indicia of credibility." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979). The Commissioner argues that there were no objective medical findings to support plaintiff's allegations. This position is unsupportable given that the diagnosis of multiple sclerosis has not been controverted and all of plaintiff's complaints related to impairments of her neurological system which were consistent with multiple sclerosis. Her statements also were supported by her doctor's reports, and there is no evidence that plaintiff is prone to exaggeration. If anything, plaintiff had to be prompted by the ALJ to describe her psychological treatment and encouraged by her children to express to her doctor the true nature of her symptoms; as Dr. Rosenstein noted, she is "not a complainer." Tr. 184.

■■■ The ALJ also found that plaintiff's lack of treatment during the relevant time period seriously undermined her claim of disability. To be sure, the ALJ is permitted to attach significance to plaintiff's failure to seek medical treatment. *See Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) ("[T]he Secretary properly attributed significance to [the plaintiff's] failure to seek medical attention ... [The] failure to present any medical evidence from that period seriously undermines his contention that he was continuously disabled during

that time."). In his decision, the ALJ referred specifically to plaintiff's failure to seek treatment during the period from August 1989 until June 1992 as confirmation that "claimant's statements about her ability to work are not entirely credible to the extent alleged." Tr. 19. However, Dr. Rosenstein never indicated in his notes from that time period that there was any need for additional treatment or doctor's visits, or any other recommended treatment which plaintiff chose to ignore. More importantly, the lack of treatment during the period between August 1989 and June 1992 cannot be found to confirm an ability to work when plaintiff's last insured date was not until December 31, 1993 and her illness is of a type which fluctuates over time. In short, the ALJ failed to support his decision to dismiss plaintiff's subjective complaints and thus improperly discredited them.

Thus, whether viewed as meeting the listings, as Dr. Berson concluded, or as not having the residual functional capacity to work, plaintiff has clearly established disability.

### Conclusion

In sum, the ALJ's decision to deny benefits is not supported by substantial evidence, and the ALJ improperly disregarded both the treating physician's opinion and plaintiff's own testimony. The medical evidence shows that plaintiff suffered from varying but persistent symptoms of multiple sclerosis that were often unpredictable and that ultimately made full-time work as a legal secretary impossible. Plaintiff's treating physician made a finding of disability and provided many records, including the results of an MRI, to support this finding. The Commissioner's own consulting medical expert agreed with the treating physician and even found that plaintiff was sufficiently impaired to qualify for a listed impairment. Finally, plaintiff's own testimony showed that she became overly fatigued when doing even everyday tasks and her difficul-

247

ties with her bowel and urinary functions compounded her other physical impairments. On this record, there is no basis for a finding that plaintiff was not disabled. Therefore, the decision of the Commissioner is vacated and the case is remanded to the Commissioner solely for the calculation of benefits.

**SO ORDERED.**