**Paula J. MOSCATIELLO, Plaintiff,**

**v.**

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 99 CV 3054(NG).**

United States District Court, E.D. New York.

Jan. 22, 2001.

Samuel R. Levy, Brooklyn, NY, for plaintiff.

Charles P. Kelly, United States Attorney's Office, Civil Division, Brooklyn, NY, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

Plaintiff Paula J. Moscatiello brings this action under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security denying her application for disability insurance benefits. This matter was previously remanded for further administrative proceedings pursuant to stipulation of the parties, so ordered by this Court on April 3, 1997. The Commissioner now moves for judgment on the pleadings. Plaintiff opposes the motion and requests that the decision of the Commissioner be reversed.

### A. Prior Proceedings

Plaintiff last worked as a receptionist in a doctor's office in 1986. She claims to have been disabled since that time. Her application for disability insurance benefits was filed on December 20, 1993. The parties agree that her insured status ended on June 30, 1991. On April 22, 1995, Admin-

istrative Law Judge ("ALJ") Norman Silverman denied her request for benefits following a hearing at which plaintiff and her husband, Vincent Moscatiello, testified. ALJ Silverman found that, although plaintiff's physical and mental impairments might be disabling at the time of his determination, the evidence did not establish that she was disabled as of June 30 1991; instead, ALJ Silverman found, plaintiff had the ability to return to her past relevant work as a doctor's receptionist and to perform a full range of sedentary work as of that date. (R. 30–33). ALJ Silverman also found, in concluding that plaintiff was not disabled: plaintiff's "testimony is exaggerated, not credible and not supported by the evidence regarding the impairments alleged" (R. 30); "review of the medical evidence alone does establish the existence of a 'severe' impairment" (R. 31); "there is limited medical documentation to support the presence of any significant physical or mental impairment prior to the date she was last insured" (R. 31). The Appeals Council adopted ALJ Silverman's decision on September 3, 1996 (R. 3–4).

On remand, the Appeals Council ordered a *de novo* hearing and directed the ALJ to further consider plaintiff's residual functional capacity, to evaluate plaintiff's subjective complaints, including pain, with specific reference to the factors specified in certain regulations and agency rulings, and to "issue a new decision, which will set forth a rationale in support of all findings and conclusions reached therein." (R. 421–22). Plaintiff testified at the new hearing before a different ALJ, Herbert S. Forsmith. Plaintiff's husband did not testify again but he submitted an affidavit. On March 24, 1998, ALJ Forsmith denied plaintiff's request for benefits, finding that, as of June 30, 1991, plaintiff did not have a severe impairment and was not significantly limited in her ability to perform work-related activities, including her past work as a receptionist, by either her physical or mental conditions. (R. 329–33). ALJ Forsmith found that plaintiff's "subjective complaints prior to June 30, 1991 are not credible considering the objective medical evidence, the conservative medical treatment of the claimant, and the claimant's testimony." (R. 331). The ALJ noted that laboratory and diagnostic studies during this earlier time period "were substantially within normal limits" and plaintiff "did not have severe restrictions on any persistent basis." (R. 331).

On April 7, 1999, the Appeals Council adopted ALJ Forsmith's decision, finding that it was supported by the record, and rejected plaintiff's argument that the ALJ had failed to consider her psychiatric impairment. (R. 252–53). The Appeals Council agreed that the record did not show that plaintiff had an impairment that significantly affected work-related activities before June 30, 1991, and pointed to the results of examinations and tests that "were consistently normal or near-normal" except for fibrocystic changes in both breasts that were benign, as well as the admission of plaintiff's spouse that plaintiff's mental problems were not diagnosed or treated before November of 1993, over two years after the period in question. The Appeals Council noted that plaintiff's subsequent medical history is relevant only to the extent that it sheds light on her condition during the earlier period.

Ms. Moscatiello has been represented at all stages of the proceedings by her current attorney, Samuel R. Levy, Esq.

### B. Plaintiff's Claims and Nonmedical Testimony

In her original application for disability benefits at the end of 1993, Ms. Moscatiello (now 61 years old), reported that she had become unable to work because of difficulty in concentrating, depression, a compulsion to repeat the same tasks over and over, fear of making mistakes, insomnia, and neck and back pains. (R. 81). She listed her disabling conditions as hepatitis C, depression, obsessive compulsive disorder (OCD), hypoglycemia, fibrocystic disease, osteoarthritis, hernia, diverticulitis

(inflammation of sacs in the wall of the colon) and headaches (R. 81). At the initial hearing, plaintiff testified that she had anxiety, panic, depression, OCD, inability to concentrate, claustrophobia, daily headaches, loss of sex drive, swelling of the eyes, tinnitus (constant ringing) in her ears, difficulty hearing in her left ear, hiatal hernia, hepatitis C, diverticulosis, shaking of the hands, calcification in her right shoulder, a spur on her foot, leg cramps, swelling in her right ankle, problems with her cervical spine and back vertebrae so that she had difficulty turning her neck and suffered back pains, lesions in her mouth, an unspecified problem with her nose, an irregular heartbeat, and low blood sugar. (R. 44–48).

Plaintiff attended high school, but did not receive a diploma. (R.42). She had worked as a receptionist and clerk in a doctor's office for 12 years before she stopped working in 1986. Asked why she stopped working, plaintiff replied, "I worked for a doctor, and I just left, and then he retired." (R. 42).[1] She is married and lives with her husband, who does most of the housework and errands, according to both her testimony and that of her husband at the first hearing. (R. 43–44, 49–50). Plaintiff testified that she had become afraid to travel, could not take the pressure of being told what to do, and was obsessed that everything had to be done exactly in a certain way. (R. 48). Plaintiff's husband, Vincent Moscatiello, in addition to testifying, also submitted an affidavit after the first hearing, which stated that plaintiff's mental condition had deteriorated over the years from when they were married in 1970. She became irritable, could not remember or concentrate, was afraid to travel alone, could not take care of personal or household chores, and was depressed and obsessive. Mr. Moscatiello opined that plaintiff's OCD began in the late 1970's but it was first diagnosed as such by Dr. Hahn, plaintiff's treating psychiatrist (R. 409). Medical records establish that Dr. Hahn first saw plaintiff on November 23, 1993 (R. 149). Plaintiff's counsel argued at the first hearing, and in his written submission to the Appeals Council, that plaintiff was disabled from gainful employment by the combination of mental and physical ailments that plaintiff described and that were reflected in medical records, and other conditions reflected in the records that plaintiff had not mentioned (including bursitis, pancreatitis (inflammation of the pancreas), gallstones, and cholecystectomy (removal of the gall bladder)). (R. 11–14, 51–52).

At the second hearing, plaintiff's counsel stated that plaintiff had several disabilities, but her "primary one is the obsessive compulsive disorder." (R. 348). Ms. Moscatiello testified at the second hearing that she stopped working because she was "overwhelmed" and could no longer cope with her anxiety and compulsion that everything had to be "perfect" (R. 350–51). Plaintiff explained that her condition had worsened over the years until she could no longer function. As an example, before she stopped working, she washed her hands constantly because she felt that they were dirty (R. 351). Plaintiff testified that she had told her internist, Dr. Atallah, of her difficulties in 1986. Dr. Atallah wanted to prescribe medication, but plaintiff was afraid to take it because of sensitivity to medication. Dr. Atallah did not recommend that plaintiff see a psychiatrist; that recommendation was first made by plaintiff's surgeon, Dr. Martuscello, according to plaintiff's testimony, resulting in plaintiff's first consultation with Dr. Hahn, which plaintiff believed was in 1992. (R. 353–55). Ms. Moscatiello also listed her physical ailments at the second hearing, including: hepatitis C, fibrocystic disease, diverticulitis, pancreatitis, hiatal hernia,

---

1. The government interprets plaintiff's testimony at the first hearing as an admission that she stopped working because her boss retired. Her testimony does not explicitly acknowledge this. At the second hearing, plaintiff attributed her quitting work to her mental and physical disabilities.

colitis, tinnitus, difficulty hearing in the left ear, migraine headaches, bursitis in the shoulder, arthritis in the thumbs, problems in the lumbar spine and cervical spine, heart murmur, mild hypoglycemia, and problems with her feet and toes (R. 356–57, 363–70). Plaintiff at first acknowledged that her physical conditions would not have prevented her from working if she did not have the mental and emotional difficulties, but then maintained that at least some of her physical ailments contributed to her inability to work. (R. 356, 363–66). Plaintiff acknowledged under questioning by the ALJ that a number of her severe physical ailments had developed in the past few years, including pancreatitis, gall bladder and stomach problems, all in approximately 1995. (R. 367–69).

Plaintiff's husband submitted a second affidavit dated shortly after the second hearing. (R. 323–24). Mr. Moscatiello states that he noticed that his wife had emotional problems when she stopped working at the end of 1986, with symptoms that would be diagnosed by Dr. Hahn as OCD on November 23, 1993. Between the time plaintiff stopped working and the time she saw Dr. Hahn, Mr. Moscatiello observed symptoms of shortness of breath, dizziness, trembling, sweating, nausea, hot flashes, chest pains and fear of dying. Plaintiff constantly washed her hands, displayed odd behavior while walking, could not remain in an enclosed area such as an automobile, and was forgetful and unable to concentrate. Before plaintiff stopped working, Mr. Moscatiello noticed that she was (and still is) constantly depressed, and insisted on everything being done perfectly. Mr. Moscatiello concluded that he knew plaintiff should have seen a psychiatrist in 1986, "but I could not accept the fact that she had mental problems." (R. 324).

In his request for Appeals Council review of the ALJ's decision after remand (R. 254–62), plaintiff's counsel submitted a list of 22 physical and psychological ailments plaintiff suffered, but emphasized plaintiff's mental and emotional condition both by itself and considered in conjunction with the physical illnesses. Before this Court, counsel emphasizes plaintiff's hepatitis C, OCD and anxiety disorders, but also submits the same list of 22 ailments and argues that plaintiff is disabled from gainful employment when all of her problems are considered together.

## C. Medical Evidence

### 1. Physical Ailments

Examination of the contemporaneous medical records reveals that, before June 30, 1991, although plaintiff was regularly seen by doctors at the Longshoremen's Medical Center (her husband is a longshoreman), there is little indication that she suffered a disabling illness which might prevent her from working except for short periods of time. Plaintiff was primarily treated for fibrocystic breast disease in this period between December 1986 and June 1991, as she periodically developed nodules and lumps, sometimes painful. (R. 97–123, 173–80). Fluid was drained from her breasts on several occasions, and benign cysts and breast nodes were excised. Plaintiff was treated for these conditions principally by Dr. Michael Martuscello, a surgeon.

Plaintiff also was treated for a variety of other ailments and symptoms in the 1986–1991 period. Most notably, on several occasions, in 1987, 1988, 1990 and 1991, plaintiff suffered episodes of chest pain. (R. 98, 100–02, 111–12, 114, 119, 122, 184–85). X-rays and EKG's were negative, and the attending physicians' diagnosis was costochondritis, i.e., inflammation of cartilage in the rib area. In the 1990 episode, plaintiff reported that she felt "a burning pain of the chest especially when she becomes agitated"; no neurological basis for her complaint was found. (R. 114). In 1989, plaintiff reported a burning sensation in her abdominal area and was treated for inflammation in the region of the duodenum. (R. 106–07, 185–86). An abdominal

ultrasound which included the liver, gall bladder, kidneys, pancreas and spleen at that time was normal. (R. 180). Plaintiff was treated for swelling and irritation of her eyelids at the beginning of 1990, possibly caused by an allergic reaction. (R. 108–110). Plaintiff was treated in 1991 for neck and back pains. (R. 119–21, 187). At that time, she reported having had an intermittent history of those symptoms. Examination revealed minimal degenerative changes in the lumbar spine, but plaintiff was found to have full ranges of motion with no weaknesses. An examining orthopedist's impression was chronic cervical and lumbosacral sprain. Minor degenerative changes and calcification was found in an X-ray examination of plaintiff's right shoulder and arm in October, 1991. (R. 187).

Plaintiff's counsel now emphasizes plaintiff's hepatitis C, in addition to her mental condition, in arguing that plaintiff is disabled. It appears from the records that plaintiff tested positive for hepatitis C antibodies from bloodwork drawn in September 1991. (R. 123, 161, 172). Plaintiff may have received infected blood from a transfusion in or after 1969. According to counsel, there was no accurate test for hepatitis C before 1992. (Pl. Br. at 3). From these meager facts, counsel advances the theory that plaintiff had become disabled from hepatitis C prior to June 30, 1991. The record, however, does not provide medical support for counsel's speculation. Plaintiff is unable to point to any medical records that indicate that plaintiff ever was treated, until after 1991, for symptoms that the attending physicians attributed to hepatitis C. In 1995, when plaintiff's gall bladder was removed and she was treated for pancreatitis, a biopsy was performed of plaintiff's liver to determine if the hepatitis virus had infected it. (R. 23–25). The liver architecture

was preserved. Mild inflammation of cells in the liver, not involving the bile ducts, was found. The pathology report notes: "The changes present are not specific and there is no evidence of chronic hepatitis 'C' ". (R. 25).

In a letter dated October 6, 1996, plaintiff's treating internist, Dr. Rami Atallah, a specialist in gastroenterolgy, noted that plaintiff's physical conditions include hepatitis C, hypoglycemia, diverticulosis, pancreatitis, degenerative changes in the lumbar and cervical spine, wrist and ankles, as well as TMJ, visual problems and hearing disorders. In addition to these physical conditions, plaintiff suffered from OCD, depression and problems with concentration. Dr. Atallah concluded that because of her chronic condition and the severity of her symptoms, he recommended that plaintiff be considered completely disabled, and he did not anticipate that she would be able to work in the future. (R. 458). Dr. Atallah's letter does not offer an opinion as to the time plaintiff became disabled, and does not address her ability to work between 1986 and 1991.[2]

The record also includes a letter from Dr. Antoine Zakhem, a surgeon, dated April 28, 1995. (R. 10). Dr. Zakhem had removed plaintiff's gall bladder less than four weeks earlier, and plaintiff had then remained hospitalized for 17 days with complications of pancreatitis. Dr. Zakhem described plaintiff as anxious, emotionally upset, and unable to concentrate on any job.

### 2. *Mental Condition*

Aside from earlier scattered references in the medical records to anxiety, plaintiff's diagnosis and treatment for mental and emotional conditions began in November 1993, over two years after her last-insured date. Plaintiff fell at a wedding,

---

**2.** Of the 22 ailments listed by plaintiff's counsel, several apparently were first diagnosed and treated after June 30, 1991; plaintiff does not point to any medical records indicating that these conditions existed or rendered

plaintiff disabled at an earlier time. The evidence pertaining to these physical conditions, both those mentioned in Dr. Atallah's letters and others referred to in more recent medical records, will not be detailed.

hitting her head and shoulder (R. 145–46). She was referred to Dr. Hahn for psychiatric evaluation, apparently because of her anxiety. (R. 147–48). During the initial visit with Dr. Hahn on November 23, 1993, plaintiff described having experienced for many years claustrophobic feelings such as inability to sit in a car or a theater for more than brief periods, to cross bridges, fly, take an elevator, or to ride on trains. (R. 149). Plaintiff further described a compulsion to fix things repeatedly. Plaintiff stated that she has suffered from these conditions since 1979, had originally tried to cope with it herself, but "she reached the point that she cannot manage by herself." (R. 149). Dr. Hahn diagnosed OCD and anxiety disorder, and prescribed drugs, including prozac. (R. 150).

Dr. Hahn saw plaintiff at regular monthly intervals for her condition until Dr. Hahn left the Longshoremen's Medical Center in 1995; plaintiff thereafter was seen regularly by Dr. Steven Newman, who replaced Dr. Hahn, and by Martin Augarten, a certified social worker and psychotherapist.

Plaintiff elaborated on her condition in subsequent visits with Dr. Hahn. In December 1993, she reported that she frequently felt "hectic", was easily upset, had frequent nightmares, could not tolerate a crowd, experienced stomach upset, and had difficulty focusing. (R. 151). She experienced difficulty tolerating the medications that were prescribed for her condition. (R. 153–55, 193). In January 1994, plaintiff described feelings of guilt that had no apparent cause, intense unjustified anger, sensations of chest tightening and shakiness, and felt "bothered by everything" (R. 155). Dr. Hahn's notes record plaintiff as stating that things that did not bother her in the past were bothering her now. In February 1994, plaintiff reported that she felt annoyed by her husband, had little patience, could not tolerate someone giving her instructions, and did things in an obsessed manner (R. 209–10). In ensuing visits, plaintiff reported that the symp-toms described above continued and that she experienced frequent headaches and depression. (R. 211–23). During a visit in September 1994, Dr. Hahn's notes reflect plaintiff stating that she was able to hide her compulsive behavior from 1970 to the present, but now could not manage alone. (R. 224). Plaintiff described in later visits with Dr. Hahn a continuation of her anxious and compulsive behavior, such as writing the same check over and over and washing her hands constantly. (R. 286–95).

In a note dated October 28, 1994, Dr. Hahn stated that plaintiff had obsessive compulsive disorder and "is totally permanently disabled psychiatrically." (R. 250). Dr. Hahn repeated the diagnosis of OCD in a note dated March 15, 1995, stating that plaintiff "is not able to function in work related setting due to her obsession." (R. 398). At the conclusion of the second hearing, the ALJ requested that plaintiff's counsel obtain a further statement from Dr. Hahn, since she had first diagnosed plaintiff's OCD and should be in the best position to shed light on plaintiff's condition during the earlier period before June 30, 1991, but had not submitted a detailed report. (R. 371–72). Plaintiff's counsel subsequently advised the ALJ by letter that he had contacted Dr. Hahn, but Dr. Hahn did not remember the case and stated that they would have to rely on her clinic notes. (R. 528).

In an undated letter following an examination on September 23, 1996, Dr. Newman, who succeeded Dr. Hahn as plaintiff's psychiatrist, described instances of the "compulsive rituals" that plaintiff had reported had caused her to stop working in 1986, such as: spending hours on a single memo to ensure that the type was "just right"; arranging objects in the office in the "right place"; ensuring that she took a certain number of steps in going through a door, and then redoing it if she made a mistake; keeping a list of numbers that she felt she needed to say; and becoming so preoccupied with contamination that she

washed her hands constantly. (R. 263–64). Plaintiff advised Dr. Newman that her ritualistic behavior had not significantly improved since Dr. Hahn began treating her, although her depression had slightly improved. Dr. Newman found that plaintiff was anxious and depressed, her concentration was impaired, and she suffered from OCD and dysthymic disorder (a form of depression). He opined that plaintiff's condition rendered her "completely and permanently disabled." (R. 264). A subsequent letter from Dr. Newman, dated April 30, 1998, noted that his diagnosis of plaintiff was unchanged and he considered her "to be completely and permanently disabled from any type of work." (R. 325). Dr. Newman added: "The following conditions have not stabilized, with medications: Obsessive Compulsive Disorder (extremely severe), Anxiety, Panic, Claustrophobia, Decreased Energy, Diminished Libido and Depression (extremely severe)." A third letter from Dr. Newman, undated, states that plaintiff, who remained under his care, still exhibits anxiety, depression, obsessive thinking, diminished libido and decreased energy, and that she remained "unable to work in any and all occupations." (R. 460).

Martin Augarten, the psychotherapist who regularly saw plaintiff beginning December 1996 on referral from Dr. Newman, submitted two letters, dated February 12, 1997 and November 20, 1997. (R. 454–57). Mr. Augarten states that plaintiff had described how she had "successfully struggled to hide" her obsessive behavior for many years, but increasing anxiety and medical problems had interfered with her ability to work, and she became unable to cope and experienced episodes of rage and crying spells. Plaintiff's difficulty in tolerating side effects of medication had limited the effectiveness of drug therapy. In the first letter, Mr. Augarten described some improvement with psychotherapy, although he stated that she currently was unable to work and was limited in social activities. (R. 456–57). The second letter reported that her condition had regressed, "with an increased occurrence of panic attacks, gastrointestinal problems and obsessive symptoms as well as traveling phobias." (R. 455). The letter noted increased stresses associated with plaintiff's medical problems and financial problems and insecurity caused by a disabling injury to her husband, which had adversely affected plaintiff's health and stability.

## D. *Discussion*

■■■ District courts are not empowered to review the Commissioner's denial of disability benefits *de novo. Fishburn v. Sullivan,* 802 F.Supp. 1018, 1023 (S.D.N.Y.1992). Absent legal error, the Commissioner's finding that a claimant is not disabled is conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Filocomo v. Chater,* 944 F.Supp. 165, 168 (E.D.N.Y.1996). Substantial evidence is defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). "It is for the SSA, and not this court, to weigh the conflicting evidence in the record." *Schaal v. Apfel,* 134 F.3d 496, 504 (2d Cir.1998). Accordingly, the Commissioner's findings must be sustained if supported by substantial evidence even though the court may disagree with Commissioner's conclusions.

These restrictions on the scope of judicial review dictate that the decision of the Commissioner in this case should be upheld. Plaintiff fails to identify any incorrect legal standards in the agency's decision. ALJ Forsmith at the second hearing appropriately recognized his affirmative obligation to develop the record. *Id.* at 505; *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). The ALJ specifically focused upon the absence of medical evidence in the record that plaintiff was unable to work at the relevant time because of her mental and psychological conditions notwithstanding the evidence indicating that

she currently was unable to work. ALJ Forsmith then afforded plaintiff's counsel the opportunity to obtain a more comprehensive report from Dr. Hahn, who had first treated plaintiff for her psychological conditions, and acted only after counsel reported that he had contacted Dr. Hahn, who could provide no further information that might illuminate plaintiff's condition during the earlier time period.

■ Both the ALJ and the Appeals Council also properly recognized that evidence of plaintiff's condition at a later time was relevant to the extent that it shed light on plaintiff's condition as of the date she was last insured. *Shaw v. Chater*, 221 F.3d 126, 133 (2d Cir.2000), quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996) ("A treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques"); *Rivera v. Sullivan*, 923 F.2d 964, 968 (2d Cir.1991) ("The mere fact that ... a claimant's condition is degenerative does not render invalid a physician's retrospective opinion"). However, in evaluating the medical evidence, the Commissioner may appropriately consider what is not said as well as what is said, if the ALJ has discharged his obligation to develop the record. *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir.1983); *Wilson v. Apfel*, 1998 WL 433809, at *7 (E.D.N.Y.1998); *see Peterson v. Gardner*, 391 F.2d 208, 209–10 (2d Cir.1968) (Commissioner "could properly refuse to find a disability in the absence of any objective medical evidence of plaintiff's [condition] at the time of the claimed disability"). This is especially appropriate where, as here, "none of the doctors who treated [plaintiff] expressed an opinion about plaintiff's ability to work prior to [the last-insured date]." *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir.1991); *see Vitale v. Apfel*, 49 F.Supp.2d 137, 142 (E.D.N.Y.1999) ("Where a plaintiff's impairment continues and becomes more severe after the expiration of insured status, such exacerbation of a pre-existing injury cannot form the basis for determination of an earlier disability.... While the existence of a pre-existing disability can be proven by a retrospective opinion, such an opinion must refer clearly to the relevant period of disability and not simply express an opinion as to the claimant's current status.").

■ The Commissioner also was entitled to consider plaintiff's failure to seek treatment for her mental condition before her last-insured date, or indeed, until 2½ years later. *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir.1989) (plaintiff's failure to seek medical attention or to present any medical evidence from the critical time period "seriously undermines his contention that he was continuously disabled during that time"); *Mahoney v. Apfel*, 48 F.Supp.2d 237, 246 (E.D.N.Y.1999) ("the ALJ is permitted to attach significance to plaintiff's failure to seek medical treatment"). Plaintiff did receive medical attention during this period, but not for her mental or emotional condition or for symptoms associated with hepatitis. Instead, she was treated primarily for fibrocystic breast disease, and secondarily for periodic episodes of chest pain, neither of which are seriously urged now as a basis for finding that plaintiff was disabled from gainful employment. In fact, the failure of plaintiff to receive medical attention for mental and emotional problems, or for the contemporaneous medical notes to reflect such difficulties in the 1986–1991 period, despite her regular visits with physicians and occasional hospitalizations during that time, indicates that the medical professionals who closely monitored plaintiff did not perceive that she suffered from a disabling mental or emotional condition. And, in the absence of objective medical evidence relating to the pertinent time period supporting plaintiff's claim of disability, the Commissioner was not bound to accept plaintiff's testimony that she was unable to work at that time. *Vitale*, 49 F.Supp.2d at 143.

■ Finally, plaintiff offers two letters from her treating doctors that were au-

thored recently and are not part of the record. One of the letters is from Dr. Atallah, dated April 6, 2000. It mainly repeats the substance of his 1996 letter, but now characterizes the hepatitis C as "advanced" and explains that plaintiff probably contracted it because she "received numerous blood transfusions since 1969." Dr. Atallah does not attempt to further pinpoint when plaintiff contracted the virus. The second letter is from plaintiff's surgeon, Dr. Martuscello, dated November 27, 1999. Dr. Martuscello states that he is writing the letter at plaintiff's request "to correct her long Medical History which will fortify her claim of disability." Dr. Martuscello has been plaintiff's surgeon since 1986, and performed surgical procedures in 1989, 1990, 1991, 1992 and 1998. Plaintiff had severe panic attacks in 1986 and afterwards before surgical procedures. Dr. Martuscello also observed in followup visits "marked depression, severe emotional instability, occasional headaches and marked inability to concentrate." He advised plaintiff to seek psychiatric assistance beginning in 1989. Dr. Martuscello concludes that plaintiff's "persistent emotional instability ... would undermine any fruitful workload."

■ The court can consider these letters only as a basis for a remand, which has not been requested. Even if a remand had been requested, plaintiff has not shown a sufficient basis for granting that relief. A court may remand a case to the Commissioner for consideration of additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding...." 42 U.S.C. § 405(g). *See Schaal,* 134 F.3d at 506 (remand for consideration of new reports from a treating psychologist properly denied where plaintiff failed to justify delay in submitting those reports); *Jones,* 949 F.2d at 60 (three-pronged requirement that evidence be new, not merely cumulative; that it be material, *i.e.,* probative and capable of influencing the decision; and that there be good cause for failure to present the evidence earlier); *Lisa v. Secretary of Dept. of HHS,* 940 F.2d 40, 45–46 (2d Cir.1991) (remand denied where no adequate explanation offered for failure to obtain earlier and to present during administrative proceeding a letter from treating physician stating for the first time that plaintiff was unable to work during the insured period). Dr. Atallah's letter does not satisfy the statutory criteria. Dr. Martuscello's letter is not material, and no good cause is shown for plaintiff's failure to present the information during the administrative proceedings; thus, the letter is not a basis for a remand even if it qualifies as "new" evidence.

### E. Conclusion

A claimant seeking disability insurance benefits is considered disabled if the claimant is unable to engage in substantial gainful activity by reason of a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A). Here the evidence supports the Commissioner's determination that plaintiff failed to meet her burden of showing that she suffered from such an impairment before her last-insured date. That petitioner may have had mental and emotional difficulties from an early age is not determinative. Instead, petitioner had to show that her condition had disabled her from gainful employment before her insured status ended. The medical evidence, however, does not support plaintiff's claim that she was disabled within that time period. The Commissioner's motion for judgment on the pleadings is granted. The Clerk of Court is directed to enter judgment for the defendant.

**SO ORDERED.**